UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DENISE CANAMORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:06CV909 TIA |
| | ) | |
| MICHAEL J. ASTRUE,[1] Commissioner, | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration. The

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.      Procedural History**

On September 12, 2002, Claimant Denise Canamore filed an application for Disability

Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr.

118-20) and an application for supplemental security income (SSI) pursuant to Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 707-10).[2] In the Disability Report Adult

completed by Claimant on September 12, 2002, and filed in conjunction with the application,

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is
substituted for Commissioner Jo Anne Barnhart, as the proper party defendant. See 20 C.F.R. §
422.210(d).
[2]"Tr." refers to the page of the administrative record filed by the defendant with its Answer
(Docket No. 12/filed August 21, 2006).

Claimant stated that her disability began on August 29, 2002, due to severe muscle spasms of neck, weakness in both shoulders, and depression. (Tr. 143-52, 707-10). On initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr. 76, 92-95, 711). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 96-97). On April 21, 2004, a hearing was held before an ALJ. (Tr. 31-75). Claimant testified and was represented by counsel. (Id.). A medical expert and a vocational expert also testified at the hearing. (Tr. 66-70, 70-74). Thereafter, on June 30, 2004, the ALJ issued a decision denying Claimant's claims for benefits.[3] (Tr. 15-30). On May 15, 2006, the Appeals Council found no basis for changing the ALJ's decision after considering the additional medical evidence and the letters from Claimant's counsel and denied Claimant's request for review of the ALJ's decision. (Tr. 9-12). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

### A.  Hearing on April 21, 2004

#### 1.  Claimant's Testimony

At the hearing on April 21, 2004, Claimant testified in response to questions posed

---

[3] Claimant previously filed applications on March 14, 2001. After an administrative hearing held on August 7, 2002, an ALJ determined that Claimant was not under a disability. (Tr. 80-88). Claimant did not appeal the judgment; therefore, the decision is res judicata that Claimant was not disabled on or before August 29, 2002. The earliest date that Claimant could claim disability is August 29, 2002, the date of the prior determination. See Bladow v. Apfel, 205 F.3d 356, 360 n.7 (8th Cir. 2000) (principles of res judicata apply where ALJ does not reopen first hearing); Green v. Heckler, 803 F.2d 528, 530 (9th Cir. 1986) (where plaintiff reapplies for benefits, the earlier denial precludes plaintiff from arguing disability during the period covered by earlier decision). The undersigned further notes that Claimant does not allege error in so limiting the period covered by her current applications.

by the ALJ and counsel. (Tr. 36-58). At the time of the hearing, Claimant was forty-three years of age. (Tr. 36). Claimant completed high school and is left-handed. (Tr. 36, 44). At the time of the hearing, Claimant weighed 244 pounds, a forty-five pound gain since August, 2002. Claimant lives in a duplex home by herself. (Tr. 36). Claimant testified that she last worked in August, 2000. (Tr. 37). Claimant has a worker's compensation case, and the case was still pending at the time of the hearing. (Tr. 46).

Claimant testified that all of her medical ailments result from injuries she suffered on the job. (Tr. 46). Claimant suffered an injury from overuse from all the lifting and pushing and pulling her job required. (Tr. 46).

Claimant testified that since August 2002, her condition has deteriorated, because she experiences more muscle spasms and more frequent depression. (Tr. 37). Claimant takes medication as treatment for the muscle spasms. (Tr. 37). Claimant lives with constant pain and discomfort. (Tr. 38). Claimant testified that she uses eating as an outlet for her depression. (Tr. 38). Claimant sometimes has crying spells throughout the day, and she takes two or three baths during the day to help her relax and ease the depression. (Tr. 38). Sometimes Claimant might not shower for two to three days. (Tr. 39). In response to the ALJ's question regarding the longitudinal medical record for counseling for depression, Claimant's counsel acknowledged that the current medical records indicate a diagnosis of depression. (Tr. 40).

Claimant testified that she has problems sleeping because she tosses and turns throughout the night trying to find a comfortable position to alleviate her neck pain. (Tr. 39). She might take a couple of muscle relaxers to alleviate the pain during the night and rub Bengay on her neck. (Tr. 39). Leaning forward trying to read or write and bending forward aggravate Claimant's neck

pain. (Tr. 40-41). Claimant testified that she can read for thirty minutes but then she has to stop and change positions. (Tr. 41). Claimant also has pain in her right shoulder. (Tr. 41). Claimant has pain and discomfort in her left hand to the point her wrist aches and her fingertips are numb. (Tr. 42). Sometimes she cannot hold a pen in her left hand. (Tr. 42). Claimant has trouble bending and stooping. (Tr. 43). Bending forward causes Claimant to become dizzy. (Tr. 43). Claimant testified that she can lift a gallon of milk out of the refrigerator with her right arm, but she cannot lift anything over her head. (Tr. 56). Claimant testified that she can walk for fifteen minutes before she starts feeling a tense sensation in her neck and she has to sit down. (Tr. 57). Claimant experiences discomfort after sitting for an hour. (Tr. 57).

Claimant has not had surgery on her right side since February, 2002. (Tr. 42). Dr. Prather last treated Claimant for pain management in May, 2002. (Tr. 42). One of her medications causes Claimant to be drowsy and another medication causes blurred vision. (Tr. 42-43).

Claimant last worked in August, 2000, as a supervisor responsible for shipping and receiving, scheduling employees' doctor appointments and physical therapy sessions, controlling time cards, and stocking employees with materials. (Tr. 43). Claimant supervised from 15 to 25 employees the last five years she worked and completed many administrative tasks like time keeping and scheduling. (Tr. 44, 71). Claimant had to lift a LP tank weighing thirty to thirty-five pounds when fueling a truck and sometimes Claimant would have to unload a trailer as part of her normal job duties. (Tr. 55, 71). Unloading the trailer required Claimant to lift boxes up to fifty pounds in weight. (Tr. 55). Prior to being a supervisor, Claimant worked as a lead person for two years at the same company, Contico International Industries. (Tr. 44-45). Claimant stopped

working in August, 2000, because Contico laid her off as a result of downsizing. (Tr. 45). Claimant applied for other positions before being relieved of her duties at Contico, but she did not work anywhere else. (Tr. 45).

Dr. Josh Dowling last treated Claimant. (Tr. 47). Claimant started taking medication for depression in 2001 when Dr. Mary Randlett, a psychologist, treated her. Claimant last saw Dr. Randlett in early 2002 because she could no longer afford her services, and Claimant did not have medical insurance. (Tr. 47). Dr. Randlett referred Claimant to Dr. Ernest at Christian Northeast Hospital for treatment in 2002. (Tr. 47-48). Claimant testified that she is not currently being treated by a psychiatrist or psychologist. (Tr. 48).

As to her daily activities, Claimant testified that she wakes up around 7:00 a.m. (Tr. 50). Claimant testified that her sister does her laundry. Claimant washes any dishes in the sink. Claimant's brother drives her to visit her sister. (Tr. 50-51). Claimant has used a computer to do research on the internet. (Tr. 51). Claimant has a valid driver's license and a car she occasionally drives to the grocery store around the corner, the doctor's office, or her sister's house. (Tr. 51-52). Claimant likes to read occasionally and listen to the television. (Tr. 52-53). Sometimes a friend picks up Claimant and takes Claimant to her house. (Tr. 54). Claimant cannot go to a movie, because she cannot sit for more than an hour without tensing up and needing to stretch. (Tr. 54).

### 2. Dr. Eric Yu

Dr. Yu, a medical expert, testified in response to questions posed by the ALJ. (Tr. 58-70). Claimant indicated that there are no x-rays of her lower back and no studies of her lower back. (Tr. 58). Dr. Yu reported that on August 9, 2001, Claimant's neurological exam was

normal and five motor strength, and examination revealed sensory intact and deep tendon reflexes symmetric. (Tr. 59). The MRI revealed minimal degenerative disc disease with no other abnormalities and based on his examination and MRI, Dr. Dowling opined that there is no role for surgical treatment in her symptoms and recommended conservative care on February 25, 2002. (Tr. 59). The MRI revealed disc bulges at C5/C6 and C6/C7 without significant canal or nerve root compromise. (Tr. 60). Dr. Dowling opined in his diagnosis that Claimant's symptoms were consistent with muscular ligamentuous strain from a secondary extensive injury. Dr. Yu noted that Claimant had been seen after a motor vehicle accident. (Tr. 60).

Dr. Yu noted that the medical records from St. Louis Connect Care show a doctor treating Claimant for neck spasms and her history of herniated discs without neurological signs. (Tr. 60-61). The MRI reviewed by Dr. Yu revealed disc bulges without herniated discs. (Tr. 61). Claimant reported having a CAT scan of her neck on April 13, 2004. (Tr. 61). Claimant's counsel indicated that he did not have that medical record. (Tr. 62).

Dr. Yu summarized Claimant's orthopedic procedures: in December, 2001, left shoulder arthroscopy and distal clavicle resection; in February, 2002, right shoulder arthroscopy; on August 9, 2001, muscular ligamentuous strain; in August, 2001, x-ray revealed normal alignment and normal motion of the cervical spine; October, 2001, MRI of cervical spine revealed disc bulges at C5/C6 and C6/C7 without significant canal or nerve root compromise; normal neurological examinations by Dr. Dowling; and in May, 2003, independent medical examination by Dr. Lee showing normal neurological exam and an impression of highly atypical pain diagram. (Tr. 62-63). Dr. Yu noted that Dr. Lee concluded that Claimant has no permanent partial disability related to the left shoulder work injury. (Tr. 63). With respect to the right side, Dr. Yu

noted that Dr. Lee concluded that Claimant has a six percent permanent partial disability of the right shoulder. (Tr. 64).

Dr. Yu opined that Claimant's conditions either singularly or in combination do not meet or equal any of the listings. (Tr. 64). Dr. Yu explained that Claimant's conditions rise to the level of an impairment having the following functional limitations: occasionally lift up to 20 pounds and frequently up to 10 pounds and stand/walk and sit six out of eight hours in an eight hour work day. (Tr. 64). Dr. Yu stated he would include the following postural limitations: avoid ladders, ropes, and scaffolds; occasional stooping, crouching, and bending; and avoid crawling. (Tr. 64-65). With respect to manipulative limitations, Dr. Yu indicated that he would limit Claimant's overhead activities to occasional and avoid constant power gripping and grasping of the left hand. (Tr. 65). Dr Yu found no visual or communicative limitations to be established. Dr. Yu suggested that Claimant avoid vibratory machines with her left side and avoid unprotected heights as environmental limitations. (Tr. 65).

Dr. Yu explained that he considered the report of Dr. Poetz, a family practitioner, finding different degrees of disability and concluding Claimant to be permanent and totally disabled as a result of the combination of her impairments. (Tr. 67). Nonetheless, Dr. Yu noted that Dr. Poetz's findings to be the only ones not similar to the findings made by Dr. Dowling, a surgeon, and Dr. Lee, an orthopedic surgeon. (Tr. 67). Thus, Dr. Yu explained that he relied on the reports of Dr. Lee and Dr. Dowling, not Dr. Poetz, because Dr. Lee and Dr. Dowling are speciality oriented. (Tr. 68). Dr. Yu acknowledged that Claimant experiences pain due to her condition but that there is insufficient objective criteria based on the MRI to go beyond what is included in Claimant's file. (Tr. 69-70).

### 3. Testimony of Vocational Expert

Vocational Expert Stephen Dolan, M.A., C.R.C.,[4] classified Claimant's past relevant work as an injection molding machine operator in 1989 in terms of <u>Dictionary of Occupational Titles</u> at the first level of a skilled job with at least a medium physical demand level. (Tr. 72). Mr. Dolan testified that Claimant next worked as a material handler, a semi-skilled job with a heavy exertional level. Claimant's last job, an assembly supervisor, was a skilled job with a light exertional level as classified by the DOT but a medium exertional level as performed by Claimant. Mr. Dolan agreed with the ALJ's assessment that if he found Claimant has the pain and limitations as set forth in her testimony that she would not be able to do any of her past work or any other kind of work.

The ALJ asked Mr. Dolan to assume that

[i]f I find that her impairments and pain limit her to light work, with additional limitations in that she should not, she would not be able to engage in ladders, ropes, climbing ladders, ropes, or scaffolds; her stooping and bending and crawling would, well, no, she would avoid crawling, and her stooping and bending would be on an occasional basis; and, overhead reaching would be an occasional basis; and, she should avoid constant power gripping and grasping; and, avoid unprotected heights. With those restrictions, would she be able to do any of her past jobs?

(Tr. 72). Mr. Dolan opined that such an individual would be able to work as an assembly supervisor as the job is normally performed in the economy, not as she performed the position and other jobs would be eliminated by the restrictions set forth in the hypothetical question. (Tr. 73). Mr. Dolan noted that the ALJ seemed to be imposing the restrictions delineated by Dr. Yu. The ALJ stated that his notes reflect that Dr. Yu set for the restriction regarding constant power gripping as to Claimant's left hand. The ALJ clarified the hypothetical question by noting that the

---

[4]"C.R.C." is the abbreviation for a certified rehabilitation counselor. (Tr. 109).

individual would avoid constant power gripping and grasping with the left extremity. Mr. Dolan opined that the individual could work as an assembly supervisor as the job is customarily performed as well as fast food counter worker jobs. (Tr. 73). The ALJ asked Mr. Dolan to consider and opine as to what jobs an individual with those restrictions but also a degree of depression and a speech impediment limiting the individual to limited public contact and relatively low stress work could perform. (Tr. 74). Mr. Dolan opined that such individual could perform general office clerk jobs and there are about 2,000 of those jobs in the St. Louis metropolitan area and 200 times that number in the national economy. Mr. Dolan further opined that such individual could work as an outside deliverer and there are about 1,000 of those jobs in the St. Louis metropolitan area and 200 times that number nationally. (Tr. 74).

### 4. Forms Completed by Claimant

In the Work History Report completed by Claimant on October 16, 2002, Claimant listed Contico International Inc. as her last employer with her last date of employment being in August, 2000. (Tr. 161-68). Claimant indicated that she worked as a supervisor and was responsible for supervising up to thirty people including hiring and firing employees. (Tr. 165).

In the Disability Report Adult completed on September 12, 2002, Claimant reported that "the pain in neck radiating down to the shoulders" limits her ability to work. (Tr. 143-52).

In the Disability Report Adult completed on November 17, 2003, Claimant reported weighing 200 pounds and unable to work due to severe muscle spasms and shoulder and neck pain. (Tr. 193-202). Claimant reported becoming unable to work because of her conditions starting on August 15, 2000, but indicated that she stopped working due to Contico's downsizing of jobs, not due to her conditions. (Tr. 194).

## III.    Medical Records[5]

On May 31, 2000, Dr. Thomas Lee completed an independent medical evaluation of Claimant.  (Tr. 657).  Claimant reported left shoulder pain problems started in 1996 when she was writing a disciplinary memo.  (Tr. 657-58).  Dr. Lee found that Claimant has right bicipital tendinitis and noted the inconsistencies in her medical history give cause for concern regarding causation.  (Tr. 658).  Dr. Lee recommended that Claimant continue a home-based exercise program for her shoulder and possibly resume physical therapy to monitor compliance with an exercise program.  (Tr. 659).

On July 20, 2000, Dr. Lee treated Claimant for persistent right shoulder pain and left shoulder pain.  (Tr. 652).  Claimant reported doing a home-exercise program for two weeks but infrequently doing the exercises.  Examination revealed impingement sign of her right shoulder to be negative and pain with abduction.  (Tr. 652).  With respect to her right shoulder, Dr. Lee recommended continuing physical therapy with maximum medical improvement within three weeks.  (Tr. 653).  Claimant remained cleared to work full duty without restrictions.  With regard to the left shoulder, Dr. Lee found Claimant's symptoms and his findings based on evaluation to be consistent with non-physiologic signs and with previous records.  Dr. Lee opined that Claimant's left shoulder and scapular complaints and left upper extremity symptoms to be pre-existing and had not changed since the October 1999, injury.  (Tr. 653).

---

[5]Records were submitted to and considered by the Appeals Council subsequent to the ALJ's adverse decision.  (Tr. 726-64).  The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence.  Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).  For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

On August 10, 2000, Claimant returned to Dr. Lee's office for a follow-up visit.  (Tr. 651).  Claimant reported feeling better with the therapy and exercises with pain returning when not completing the exercises.  Examination revealed impingement sign negative in both forward flexion and abduction.  Dr. Lee further noted pain with internal rotation, some mild tenderness to palpation of the acromioclavicular joint, and full range of motion of the shoulder.  Dr. Lee found Claimant to be independent with her exercises and released her from care inasmuch as Claimant had reached maximum medical improvement.  Dr. Lee released Claimant to work full duty without restrictions.  (Tr. 651, 654).

On September 6, 2000, on referral by Gallagher Bassett, Dr. Thomas Lee, an orthopeodic surgeon, completed an independent evaluation of Claimant.  (Tr. 649).  Dr. Lee noted that he last treated Claimant for her right shoulder on August 20, 2000.  Claimant reported increased symptoms in her left shoulder since the last visit and being laid off on August 25, 2000.  Claimant has pain in both shoulders and left upper extremity symptoms.  Examination revealed exquisite pain reaction at C7 in the midline and mild to moderate decreased flexion and extension and lateral bend with pain on the extremes of each.  Dr. Lee noted left shoulder impingement to be negative and diffuse, inconsistent tenderness over the left shoulder.  (Tr. 649).  Dr. Lee opined that Claimant has left shoulder acromioclavicular arthrosis, a degenerative disorder.  (Tr. 650). Dr. Lee opined that given Claimant's current physical findings and her prior history of nonphysiologic findings, Claimant's prognosis for obtaining complete relief of symptoms by any method of treatment to be poor.  Nonetheless, Dr. Lee found that based on her partial improvement with previous surgery on her shoulder, there is some hope of improvement with treatment for her left acromioclavicular joint symptoms.  Dr. Lee recommended being cautious

prior to proceeding with treatment more than an injection or additional therapy. In conclusion, Dr. Lee opined that Claimant "remains cleared for working full duty without restrictions." (Tr. 650).

On October 12, 17, 19, 21, 24, and 26, 2000, Dr. Robert Poetz, a D.O., treated Claimant for neck and shoulder pain as requested by her attorney. (Tr. 548-53).

On May 14, 2001, Dr. Poetz evaluated Claimant for work-related injuries occurring while employed with Contico as a material handler. (Tr. 256). Claimant's chief complaints included a burning sensation in her neck, numbness in her arm, aching in both shoulders, pain in her right elbow, and occasional numbness in her third, fourth, and fifth fingers on the right hand. Claimant reported that she developed pain in her right shoulder which progressively worsened over time and received physical therapy treatment with improvement noted before being released from treatment on December 19, 1999. (Tr. 256). Claimant developed increased symptoms in her right shoulder on May 12, 2000, after completing inventory requiring her to lift heavy totes, load and unload merchandise, and stack various materials. (Tr. 257). Examination revealed decreased range of motion in the right shoulder with elevation to 150 degrees and in the left shoulder with elevation to 120 degrees. (Tr. 258). Dr. Poetz diagnosed Claimant with left shoulder sprain and carpal tunnel syndrome, right shoulder sprain and bicipital tendinitis, and cervical sprain with exacerbation of cervical degenerative disc disease. (Tr. 259). Dr. Poetz recommended an orthopedic referral, physical therapy, steroid injections, and weight loss. (Tr. 259). Based on his evaluation, the patient's verbal history, and his review of the medical records submitted to him, Dr. Poetz opined that Claimant has permanent partial disability in varying degrees to the upper left

extremity, to the body as whole, and the upper right extremity. (Tr. 260).[6]

On July 11, 2001, Claimant received treatment in the emergency room at Barnes-Jewish Hospital for treatment of neck and upper back pain stemming from motor vehicle accident the day before. (Tr. 227). The treating doctor ordered x-rays and thereafter Claimant waited for neurology consultation. (Tr. 230). After seeing the neurologist, Claimant was discharged to home with treatment of medication pain relief including Ibuprofen and Flexeril. (Tr. 230, 232, 234). The x-rays of Claimant's cervical spine revealed grade I anterolisthesis of C4-5 with flexion and small degenerative anterior spurs from C5 to C7. (Tr. 235-36, 642-43).

On August 9, 2001, during a follow-up visit after being treated for pain following a motor vehicle accident, Claimant reported continued neck pain. (Tr. 638). Claimant received conservative treatment including non-steriodal anti-inflammatory drugs and a Flexeril prescription. Examination revealed decreased range of motion secondary to pain in Claimant's neck and paraspinous and midline tenderness extending from her mid-cervical spine down to her upper interscapular region. (Tr. 638).

In the radiology report dated August 9, 2001, Dr. David Rubin noted the x-ray of the flexion and extension views of Claimant's cervical spine revealed normal alignment of her cervical spine with normal motion on flexion and extension and moderate degenerative disc disease at C5-6 and C6-7. (Tr. 225, 639). In his review of the x-ray, Dr. Dowling found that the repeat flexion-extension x-rays revealed no abnormal movement or fractures and a straightening of the

_____

[6]A medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

cervical spine on flexion. (Tr. 640). Dr. Dowling opined that Claimant's symptoms were consistent with muscular ligamentuous strain from a flexion-extension injury. Dr. Ritchie recommended physical therapy and prescribed Darvocet for pain and Soma for a muscle relaxant. (Tr. 640).

In a follow-up visit with Dr. Ritchie on September 17, 2001, Claimant reported suffering a neck injury on July 10, 2001, and continued neck pain. (Tr. 637). Claimant reported not being able to undergo physical therapy because of problems with her insurance carrier. Examination revealed some mild midline interspinous tenderness at the base of Claimant's neck and mild restriction of flexion and extension with extreme movements. Dr. Ritchie ordered repeat flexion-extension views as well as a MRI of Claimant's cervical spine in order to rule out more significant injury. (Tr. 637).

In the radiology report dated September 17, 2001, Dr. Rubin noted that the x-ray of Claimant's cervical spine revealed moderate degenerative disc disease at C5-6 and C6-7 and mild cervical hypomotility of flexion. (Tr. 224).

In an office visit with Dr. Ritchie on September 21, 2001, Claimant reported bilateral shoulder pain with more pain in the left shoulder and increased pain with overhead activities and across body maneuvers. (Tr. 627). Claimant also reported numbness and tingling into her arms and upper extremity. Examination revealed exquisite tenderness over the AC joint and provocative with across body maneuvers. Dr. Ritchie found that Claimant has AC arthritis and symptoms from her shoulder and possibly some cervical disc bulging or radicular pain contributing to her pain. Dr. Ritchie wanted to wait and hear from Dr. Chabot and recommended that Claimant complete a course of physical therapy. (Tr. 627).

On September 21, 2001, Dr. Michael Chabot, D.O., evaluated Claimant on referral by Dr. Joseph Ritchie. (Tr. 546). Claimant reported neck pain beginning in 1996 after being injured on the job. (Tr. 546). Examination revealed full active and passive range of motion of her left shoulder. (Tr. 547). Cervical examination revealed little to no tenderness to palpation and a full range of motion. Dr. Chabot recommended continued conservative measures, mainly physical therapy and use of anti-inflammatory medication. Dr. Ritchie encouraged Claimant to participate in some kind of physical activity to improve her general conditioning. (Tr. 547).

In the radiology report dated October 12, 2001, Dr. Benjamin Lee noted that the MRI of Claimant's cervical spine revealed minimal degenerative disc disease at the C5-C6 and C6-C7 level with no other abnormalities present. (Tr. 223, 277, 636).

On October 18, 2001, in a follow-up visit with Dr. Dowling, Claimant reported significant increase in her pain since motor vehicle accident in July. (Tr. 634). Examination revealed limited range of motion in Claimant's neck. Based on his review of Claimant's cervical spine x-rays, Dr. Dowling noted that Claimant has degenerative disc disease with diffuse posterior disc bulges at C5-6 and C6-7 without significant canal or nerve root compromise. Dr. Dowling recommended that Claimant continue with physical therapy and home cervical traction. Dr. Dowling explained that there are no surgical treatments inasmuch as Claimant has no evidence of significant canal or nerve root compromise. Dr. Dowling referred Claimant to Dr. Heidi Prather to see if there were any non-surgical approaches for treating her pain.

On referral by Dr. Dowling, Claimant received physical therapy treatment at the Rehabilitation Institute of St. Louis from October 1, 2001, through November 16, 2001. (Tr. 565-80). Claimant failed to return to physical therapy treatment as scheduled and therefore the

therapist discharged her from treatment. (Tr. 580).

On December 14, 2001, Dr. Ritchie performed left shoulder glenhumeral arthroscopy, arthroscopic bursectomy, and distal clavicle resection. (Tr. 625). Claimant tolerated the procedure well. (Tr. 626).

On December 17, 2001, Dr. Heidi Prather, a D.O., evaluated Claimant for neck and shoulder pain. (Tr. 246, 275). Claimant reported she was doing okay until a motor vehicle accident in January, 2000. Claimant's pain feels better with a recliner and Ben-Gay ointment. (Tr. 246, 275). Dr. Prather recommended physical therapy as treatment . (Tr. 247, 276, 633).

On December 19, 2001, in a follow-up visit with Dr. Ritchie one week post op for her shoulder arthroscopy and distal clavicle resection, Claimant reported feeling a difference and not having any significant pain or problems. (Tr. 624). Examination revealed overhead motion good without difficulty. Dr. Ritchie indicated that he would prescribe physical therapy treatment in a few weeks to continue Claimant's range of motion and strengthening program. (Tr. 624).

Claimant started physical therapy as treatment for her shoulder pain and shoulder distal clavicle resection on December 21, 2001, and attended six treatment sessions. (Tr. 608). The treatment notes reveal that Claimant failed to keep two scheduled appointments and called and cancelled two appointments. (Tr. 611-12). On January 17, 2002, John Wood, the physical therapist at ProRehab, reported to Dr. Ritchie that Claimant's strength and range of motion were progressing well toward long-term goals but that her progression had been limited due to noncompliance with home exercise program and physical therapy visits. (Tr. 623). In the discharge summary dated February 12, 2002, the therapist noted improvement in Claimant's quality of movement through prescribed therapy program and discharged on January 17, 2002.

(Tr. 608).

On February 7, 2002, Dr. Joseph Ritchie performed glenonhumeral arthroscopy of Claimant's right shoulder and arthroscopic distal clavicle resection and subacromial decompression as treatment for her right shoulder pain and impingement. (Tr. 581-608, 619-20). Dr. Ritchie noted that he had previously treated Claimant for her left shoulder and had an excellent result from a decompression and distal clavicle resection. (Tr. 591). Dr. Ritchie opined that unfortunately Claimant has bilateral acromioclavicular joint arthritis. Dr. Ritchie noted that Claimant experienced a significant amount of pain relief from the earlier procedure. (Tr. 591). After the procedure, Dr. Ritchie prescribed physical therapy for range of motion. (Tr. 601).

In an office visit on March 14, 2002, Dr. Prather noted that she had evaluated Claimant three months earlier for neck pain status post flexor extension injury. (Tr. 243, 274). Dr. Prather noted that Claimant has been working on physical therapy but Claimant still experiences a catching sensation on the right side of her neck into her proximal shoulder. Dr. Prather's review of the MRI revealed minimal degenerative changes at C5-6 and C6-7. Dr. Prather recommended administering a medial branch block and Claimant continuing her exercise program. (Tr. 243, 274).

On January 28, 2002, February 4, 14, and 27, 2002, and April 3, 2002, Dr. Mary Randlett, Ph.D., treated Claimant for depressive disorder not otherwise specified. (Tr. 677-90). During the February 27, 2002, session, Dr. Randlett discussed Claimant's challenge of recovery through physical pain and referral to sliding scale therapists for after insurance. (682). Dr. Randlett discharged Claimant on April 3, 2002, due to end of insurance benefits and made referrals for sliding scale therapist. (Tr. 681).

In a follow-up visit with Dr. Dowling on February 25, 2002, Claimant reported improvement in her shoulder problems since the surgeries but she still had posterior neck pain. (Tr. 632). Dr. Dowling recommended continued conservative management. (Tr. 632).

The March 15, 2002, examination by Dr. Ritchie revealed full range of motion, no tenderness to palpation, rotation cuff excellent and Claimant felt good at that time and "not having any problems or discomfort." (Tr. 616).

On March 19, 2002, Dr. Theodore Vandervelde performed a medial branch facet block of Claimant's right C5-C6 and C6-C7 and noted complete initial relief of presenting symptoms. (Tr. 239, 630-31).

In a follow-up office visit on May 2, 2002, Claimant reported to Dr. Prather the medial branch block C4-5 and 5-6 completely diminished her pain for two weeks but she started to have some increased symptoms in the past without burning into the right side of the neck. (Tr. 241, 272). Claimant recognized that she would have to live with some of this pain, and she is able to do her functional activities. Examination revealed normal strength testing for shoulder abduction and shoulder internal and external rotation. Claimant agreed to repeat injection when the pain is bad enough. Dr. Prather discussed with Claimant the importance of continuing with a maintenance exercise program. (Tr. 241, 272). Dr. Prather concluded that she would follow up with Claimant on an as needed basis. (Tr. 242, 273).

On September 23, 2002, Dr. Poetz reevaluated Claimant's disability status as requested by Claimant's counsel. (Tr. 251, 281). Claimant's chief complaints were as follows:

> My neck constantly burns. I get migraines at times when my neck bothers me. I have sharp intense pain in my shoulder blades that travels down my arms. The pain switches from side to side. I have numbness in the fingers of my left hand

occasionally.  I cannot lift, carry or reach to the same capacity as before.

(Tr. 251, 281).  Since last treating Claimant on August 9, 2001, Dr. Poetz noted that Dr. Dowling evaluated Claimant's neck pain.  Claimant developed increased pain in her neck and shoulders after being hit from behind by another driver on July 10, 2001.  (Tr. 251, 281).  Claimant's symptoms were consistent with a muscular strain from a flexion-extension injury.  (Tr. 252, 282).  Dr. Dowling recommended conservative treatment.   Dr. Poetz noted that Claimant is a morbidly obese woman.  (Tr. 252, 282).  Examination revealed a decreased range of motion at the cervical spine but the thoracic and lumbar spine has a good range of motion without deformity.  (Tr. 253, 283).  Dr. Poetz included left shoulder strain, left carpal tunnel syndrome, moderate posterior disc bulging C5-6, C6-7, and C7-T1, cervical sprain with exacerbation of cervical degenerative disc disease, right shoulder sprain, and morbid obesity.  (Tr. 253-54, 283-84).  Dr. Poetz included in his treatment recommendations weight loss and no heavy lifting or strenuous activity.  (Tr. 254, 284).  Based on his evaluation, the patient's verbal history, and his review of the medical records submitted to him, Dr. Poetz opined that "this patient is **Permanently and Totally Disabled** as a result of the combination of the present and prior disabilities.  She is and will be permanently and totally unemployable in the open labor market." (Tr. 254-55, 284-85).[7]

In the Physical Residual Functional Capacity Assessment completed on December 16, 2002, Dr. Kevin Threlkeld, listed cervical changes as Claimant's primary diagnosis and obesity and shoulder orthroscopies as secondary diagnosis.  (Tr. 261).  Dr. Threlkeld reviewed Claimant's

---

[7]A medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005), *citing* <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004).

medical records for the purpose of assessing Claimant's physical residual capacity. Dr. Threlkeld indicated that Claimant's exertional limitations included that Claimant could occasionally lift twenty pounds; could frequently lift ten pounds; could stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and was limited in upper extremities due to decreased range of motion, pain, and spasms in both shoulders and decreased range of motion in her cervical spine. (Tr. 262-63). Dr. Threlkeld indicated that Claimant's postural limitations included that Claimant could never climb ropes/scaffolds, occasionally balance, stoop, kneel, crouch and crawl, and never climb ramps/stairs. (Tr. 263). Dr. Threlkeld further indicated that Claimant has established manipulative limitations with respect to reaching all directions and overhead and handling on the left side and no established visual limitations. (Tr. 264). With respect to communicative limitations, Dr. Threlkeld found none to be established. (Tr. 265). Dr. Threlkeld further found that Claimant has no environmental limitations except for the need to avoid vibration. (Tr. 265). Based on his thorough review of the medical records, Dr. Threlkeld determined that Claimant's sitting/standing limitation allegations are not clearly defined but that her lifting and reaching difficulties would be explainable in light of her neck and shoulder conditions. (Tr. 266). In conclusion, Dr. Threlkeld opined that Claimant's allegations overall are considered at least partially credible. (Tr. 266).

On May 22, 2003, Dr. Newby at Saint Louis ConnectCare treated Claimant for shoulder/neck pain. (Tr. 644, 673). Claimant reported having been treated by Dr. John Daniels at BJC until February, 2002, when she no longer had insurance coverage. Dr. Newby prescribed Flexeril and Amitriptyline. (Tr. 644, 673).

On May 23, 2003, on referral by Gallagher Bassett, Dr. Thomas Lee, an orthopedic

surgeon, evaluated Claimant. (Tr. 645). Dr. Lee noted that he had previously evaluated Claimant in 2000. Claimant's chief complaint was left shoulder strain, stress, and fatigue. Claimant stopped working in August, 2000. After surgery, Claimant reported her symptoms improved but gradually some symptoms have recurred more so on her left side with the symptoms increasing in the last year. Claimant reported left arm aches and pain in the left shoulder blade. (Tr. 645). Examination revealed forward flexion to 170 degrees on the right side and abduction negative for pain with internal rotation. (Tr. 646). On the left side, Claimant has severe pain in response with impingement sign testing and internal rotation and flexion. Dr. Lee noted that Claimant resists the last 20 degrees of flexion with maximum flexion 160 degrees. Dr. Lee noted that Claimant has marked tenderness response at the C7 prominence but she denied pain in the upper spine. (Tr. 646). In his impression, Dr. Lee found status post right shoulder acromioplasty and distal clavicle excision and status post revision shoulder acromioplasty and distal clavicle excision. (Tr. 647). Dr. Lee opined in relevant part as follows:

> [T]he need for the surgical treatment of the left and right shoulder is unrelated to the work at Contico. It is my opinion that the need for 12/7/02 surgery on the left and right shoulder was more likely necessitated by the motor vehicle accident of 7/10/01 and not necessitated by the work injuries of 12/3/99 and 5/12/00.

(Tr. 647). Dr. Lee further opined that Claimant has no permanent partial disability due to the work injuries related to the left shoulder, and a 2% permanent partial disability at the level of the right shoulder. (Tr. 647). With regard to permanent partial disability due to the motor vehicle accident of July 10, 2001, Dr. Lee opined that Claimant has a 6% permanent partial disability to the level of the right shoulder, and a 4% permanent partial disability at the level of the left shoulder. (Tr. 647-48).

On referral by Claimant's counsel, Timothy G. Lalk, a vocational rehabilitation counselor, evaluated Claimant on June 13, 2003. (Tr. 176-92, 206-22). Before assessing her ability to return to employment, Mr. Lalk reviewed medical records forwarded and the deposition of Dr. Poetz. (Tr. 176, 206). Claimant reported pain in her left shoulder and left hand, along with the burning in her neck, as her primary complaints. (Tr. 185, 215). Claimant reported being able to stand for no more than thirty minutes at a time due to increased neck pain being able to walk one to two blocks, being able to hold no more than five to ten pounds, and being able to sit one to two hours. (Tr. 185, 215). Claimant reported being treated by Dr. Prather for pain medication and a doctor at a local free clinic for depression, pain, and muscle spasms. (Tr. 186, 216). In August, 2000, Claimant reported being laid off from her position at Contico due to downsizing. (Tr. 188, 218). Claimant received unemployment benefits for six months after being laid off, and she has made no attempt to find employment since that time. Claimant indicated that she is capable of working with a word processor and has experience in scheduling and supervising between five to twenty-five workers. (Tr. 188, 218). With respect to functional restrictions/limitations, Claimant reported being able to perform chores at home such as washing dishes, sweeping, light loads of laundry, and cooking light meals using the microwave or stove top. (Tr. 189, 219). Claimant requires assistance with shopping when she purchases more than two to three items at a time. Claimant reported using her personal computer to do research on the Internet and enjoying reading. (Tr. 189, 219). Mr. Lalk opined that based on the medical records submitted to him, Claimant is not "able to return to her job at Contico or any other similar position which she has held in the past." (Tr. 190, 220). Mr. Lalk explained that Claimant is not employable in the open labor market because she has "poor capability of competing with other

workers for jobs which could accommodate her physical limitations and which could be considered within her range of experience and overall capabilities." (Tr. 192, 222). Mr. Lalk opined that the primary reason Claimant is unemployable is because of the combination of complaints and limitations Claimant reported to him including left shoulder and hand pain and chronic neck pain. Mr. Lalk explained that he was not trying to establish a medical connection inasmuch as connection is reserved for treating and examining physicians and so he based his opinions upon the description of Claimant's complaints and limitations in concluding "that there appear to be multiple problems which are affecting her ability to work."[8] (Tr. 192, 222).

On August 20, 2003, Claimant received urgent care treatment at St. Louis Connect Care Clinic for an insect bite and muscle spasms in cervical area. (Tr. 294-97, 672). On September 26, 2003, Claimant missed her scheduled appointment. (Tr. 672).

On November 18, 2003, Claimant reported pain in neck and both shoulders during treatment at St. Louis ConnectCare Clinic. (Tr. 670). Claimant's weight was 226 pounds. (Tr. 670). The treating doctor referred Claimant to Hopewell Clinic for evaluation and management of depression. (Tr. 671).

On January 20, 2004, Claimant received treatment for cervical sprain, chronic depression, and obesity at the St. Louis ConnectCare Clinic during a routine medical check up. (Tr. 668-69).

The March 16, 2004, treatment notes from St. Louis ConnectCare Clinic reflect that Claimant received follow-up treatment for spasms and shoulder pain. (Tr. 705). Claimant

---

[8]A medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

weighed 242 pounds.  (Tr. 705).

The CAT scan of Claimant's cervical spine on April 13, 2004, revealed moderate uncinate hypertrophy at C3/4 on the right producing very mild encroachment and compromise in the neural canal with no significant compression of nerve root.  (Tr. 698, 759).  At C5/6, the scan revealed right-sided uncinate hypertrophy with no significant narrowing of the right exit foramen.  (Tr. 698, 759).

On April 9, 2004, Claimant reported continued neck pain, chronic depression, and obesity.  (Tr. 703-04).  Claimant weighed 237 pounds.  (Tr. 704).  The treatment notes dated April 14, 2004, from St. Louis ConnectCare Clinic noted Claimants medications to be Cyclobenzeprin, Amitryline, and Naproxen.  (Tr. 701).  In a follow-up visit on May 20, 2004, Claimant reported continued neck and back pain, chronic depression, and left arm/hand weakness.  (Tr. 740).  The treating doctor indicated that Claimant would have a MRI of the cervical spine in order to evaluate left arm weakness and neck/shoulder pain.  (Tr. 740-42).

The June 11, 2004, MRI of Claimant's cervical spine revealed central osteophyte/disc complexes producing effacement of the ventral sac at C5/6 and C6/7.  (Tr. 731, 758).  The results further showed no compression on the spinal cord or exit nerve root sheaths at either level.  (Tr. 731, 758).

On June 24, 2004, Claimant returned to the St. Louis ConnectCare Clinic for treatment of left shoulder pain and left arm/hand weakness and numbness.  (Tr. 737).  Examination revealed a full range of motion of the cervical spine with tenderness at C5.  (Tr. 737).  Claimant would be referred to a neurology clinic.  (Tr. 738-39).  The treatment notes dated September 1, 2004, noted Claimant received follow-up treatment for pain in shoulders and neck.  (Tr. 734).  Claimant

weighed 246 pounds. Examination revealed a full range of motion of the cervical spine and of the left shoulder but with pain. (Tr. 734).

During treatment at the St. Louis ConnectCare Clinic in November, 2004, Dr. Wanda Trotter prescribed the following medications: Flexeril, Naproxen, Amitriptyline, and Elavil. (Tr. 760-64).

On September 27, 2004, Dr. Georgia Jones, a licensed psychiatrist, completed a psychiatric examination. (Tr. 750). Dr. Jones listed depression, severe pain, and muscle spasms as Claimant's chief complaints. (Tr. 750). Claimant listed Cyclobenzaprine, Amitriptyline, and Naproxen as her medications. (Tr. 751). Dr. Jones included in her diagnosis major affective disorder, chronic pain, and a GAF of 60-65. (Tr. 753).

## IV.    The ALJ's Decision

The ALJ found that Claimant met the disability insured status requirements on August 29, 2002, the date Claimant alleged she became unable to work, and remains insured through December 31, 2005, based on her current earnings record. (Tr. 29). The ALJ found that Claimant has not engaged in substantial gainful activity since August 29, 2002, the alleged onset date of disability. The ALJ found that the medical evidence establishes that Claimant has degenerative disc disease of the cervical spine, morbid obesity, status post right shoulder distal clavicle resection and subacromial decompression in February, 2002, status post revision of left shoulder acromioplasty originally performed in 1994, and arthroscopic bursectomy and distal clavicle resection of the left shoulder in December, 2001, a remote history of left carpal tunnel release on April 4, 1996, and a depressive disorder not otherwise specified. The ALJ determined that while none of her impairments is severe if considered separately, in combination, the

- 25 -

impairments are severe. Nonetheless, the ALJ determined that Claimant's impairments do not singly, or in combination, meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 29).

The ALJ further found that Claimant's statements concerning her impairments and their impact on her ability to work on and before December 31, 2005, the date her insured status expired, are not entirely credible for reasons explained in the decision. (Tr. 29). The ALJ found that Claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work that involves lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and/or walking and sitting for six out of eight hours in an eight-hour workday. As the exertional limitations, the ALJ determined that Claimant cannot climb ladders, ropes or scaffolds, can occasionally bend and crouch, must avoid crawling, and can occasionally reach overhead. Further, Claimant should avoid constant power gripping and grasping with her left hand. With respect to environmental restrictions, the ALJ found that Claimant must avoid vibrating machinery with her left side and unprotected heights. The ALJ opined that Claimant is unable to perform her past relevant work. (Tr. 29).

The ALJ noted that Claimant is a younger individual with a high school education. (Tr. 29-30). Considering Claimant's skilled work experience and exertional limitations in combination with her age, educational background, and work experience, the ALJ opined that Claimant is not disabled. (Tr. 30). The ALJ further opined that although Claimant is unable to perform the full range of light work, she is capable of performing work that exists in significant numbers in the national economy including employment as a General Office Clerk and Outside Deliver, and thus Claimant is not disabled. The ALJ thus concluded that Claimant was not under a disability at any

time through the date of his decision.  (Tr. 30).

Specifically, the ALJ considered Claimant's prior work record; information and observations by treating and examining physicians and third parties; precipitating and aggravating factors; type, dosage, effectiveness and adverse side-effects of any pain medication; other treatment for relief of pain or other symptoms; functional limitations; and daily activities.  The ALJ assessed Claimant's testimony, along with the objective medical findings prior to August 29, 2002, and found that the objective medical evidence failed to provide strong support for Claimant's allegations of disabling symptoms and limitations.  The ALJ noted that Claimant has a long history of upper extremity pain and a history of depression but most of the medical evidence is dated before August 29, 2002, the starting date with respect to review of the evidence.  The ALJ found that Claimant's treatment history suggests that her description of pain is exaggerated inasmuch as Claimant had a relatively limited history of medical treatment; and she was noncompliant with a home exercise program and failed to attend half of her physical therapy sessions.  Further, Claimant never used a TENS unit for pain, and at the time of the hearing, Claimant was not taking narcotic pain medication.  Likewise, nothing in the record indicated recent ER treatment or hospitalizations for pain relief or aggressive medical treatment.  Claimant had not received treatment by a mental health specialist for her alleged mental impairments.  Claimant never reported to any doctors any side effects caused by her medications.  The ALJ determined that the absence of consistent treatment during the period of alleged disability was inconsistent with severe and disabling symptoms.  (Tr. 24-26).[9]

_____

[9]To the extent that Claimant argues that the ALJ failed to consider obesity, the undersigned finds no support anywhere in the record for Claimant's contention that the ALJ erred in failing to consider her obesity as a severe impairment, and to determine its effect on her limitations.  In her

Although Dr. Poetz opined that Claimant is permanently and totally disabled and unemployable in the open labor market, the ALJ noted that Dr. Poetz recommended that Claimant avoid only excessive and repetitive use of her upper extremities, heavy lifting, and strenuous activity. The ALJ did not accept Dr. Poetz's opinion finding inconsistencies with the opinions of other medical examiners. Further, Dr. Poetz had not treated Claimant for over five years and in September, 2002, Dr. Poetz did not offer any specific treatment or prescribe any medication. Further, the ALJ noted that Dr. Poetz is a doctor of osteopathy and a family physician. The ALJ also noted that the record did not contain any opinions from other treating or examining doctors indicating that Claimant was disabled or had limitations greater than those found by the ALJ. In addition, the ALJ mentioned the conclusions of the state medical consultant finding Claimant can perform a limited range of light work. (Tr. 24).

Further, the ALJ found Claimant's descriptions of her daily activities not to be inconsistent with light work. Further, Claimant's medications did not suggest more limiting impairments, nor did she allege any persistent side effects. In addition, Claimant stopped working because she was laid off due to downsizing, not because she had any physical or mental impairment precluding her from working. After considering the entire record, the ALJ found that Claimant had the RFC to

---

applications for disability benefits, Claimant alleged disability due to severe muscle spasms of neck, weakness in both shoulders, and depression. A review of Claimant's applications show that Claimant failed to allege obesity as a basis for disability. Next, Claimant never alleged that her obesity was disabling, and she presented no medical evidence substantiating such claim. Moreover, Claimant never alleged any limitation in function as a result of her obesity in her applications for benefits or during the hearing. The ALJ is under "no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (quoting Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996)). Accordingly, this claim is without merit.

perform the full range of light work. Thus, the ALJ concluded that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 26-28).

## V.     Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine

whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

1.  The credibility findings made by the ALJ.

2.  The claimant's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the claimant's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ improperly determined her RFC. Claimant also contends that the ALJ failed to properly assess Claimant's credibility regarding her subjective complaints. Finally, Claimant contends that testimony of the vocational expert did not constitute substantial evidence upon which a determination could be made that claimant was not disabled arguing that the expert based his opinion on a flawed hypothetical question.

A.  Credibility Determination

The determination of Claimant's credibility is for the Commissioner, and not the Court, to decide. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). The ALJ may not discredit Claimant's complaints of pain solely because they are unsupported by objective medical evidence. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Jones v. Chater, 86 F.3d 823, 826 (8th

Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).

Instead, the ALJ must also consider all of the evidence relating to the Claimant's prior work history, the absence of objective medical evidence to support the complaints, and third party observations as to:

1.    claimant's daily activities;

2.    duration, frequency and intensity of the pain;

3.    precipitating and aggravating factors;

4.    dosage, effectiveness and side effects of medication;

5.    functional restrictions.

Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (stating factors from Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  The ALJ may disbelieve the claimant's subjective complaints "if there are inconsistencies in the evidence as a whole." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

The undersigned recognizes that pain itself may be disabling.  See Loving v. Department of Health & Human Servs., 16 F.3d 967, 970 (8th Cir. 1994).  However, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Jones, 86 F.3d at 826.  "[T]he real issue is how severe the pain is." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)).  While there is no doubt that claimant experiences pain, the more important question is how severe the pain is. Gowell, 242 F.3d at 796.

When determining a claimant's complaints of pain, the ALJ may disbelieve such complaints if there are inconsistencies in the evidence as a whole.  Polaski, 739 F.2d at 1322. The

ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, his decision should be upheld. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1966). The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); see also Brown, 87 F.3d at 966. The ALJ's credibility findings are entitled to deference if the findings are supported by multiple valid reasons. See Goff v. Barnhart, 421 F.3d 785, 791-92 (8th Cir. 2005); Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination).

In his decision the ALJ thoroughly discussed the medical evidence of record, the lack of ongoing medical evidence corroborating Claimant's subjective complaints of functional limitations, the lack of prescription pain medications, and the testimony adduced at the hearing. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of

objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician stated that Claimant was disabled or unable to work during the relevant time period.[10] See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the

---

[10] The ALJ discredited Dr. Poetz's opinion inasmuch as Dr. Poetz had not treated Claimant for five years and his opinion was inconsistent with his recommendations set forth on October 3, 2002. The ALJ found that there was no substantive evidence to support Dr. Poetz's opinion and his opinion was refuted by his own recommendations and other medical specialists.

credibility of her testimony and of her complaints). In addition, the ALJ noted that no physician

had ever made any medically necessary restrictions, restrictions on her daily activities, or

functional or physical limitations except for avoiding a lot of lifting, pushing, and pulling.[11]

Further, the ALJ noted that despite her allegations of persistent pain, Claimant has not received

ongoing medical attention or treatment for her pain. Kelley v. Barnhart, 372 F.3d 958, 961 (8th

Cir. 2004) ("Infrequent treatment is also a basis for discounting a claimant's subjective

complaints."). After being treated by Dr. Lee in September, 2000, Claimant waited to seek

medical treatment again from him until May, 2003, on referral by Gallagher Bassett. See Johnson

v. Chater, 108 F.3d 942, 947 (8th Cir. 1997) (determining that failing to seek treatment was

inconsistent with claimant's subjective complaints of disabling pain); Chamberlain v. Shalala, 47

F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of

disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993) (lack of ongoing

treatment is inconsistent with complaints of disabling condition). Likewise, the medical evidence

is devoid of any evidence showing that Claimant's condition has deteriorated or required

aggressive medical treatment although Claimant testified otherwise at the hearing. See Id.; Ply v.

Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a

---

[11]In rejecting Dr. Poetz's medical opinion finding Claimant permanently and totally disabled and unemployable in the open labor market, the ALJ noted how Dr. Poetz had last treated Claimant more than five years before he treated her in September, 2002. Likewise, after making such a finding of disability, he only recommended that Claimant avoid excessive and repetitive use of her upper extremities, heavy lifting, and strenuous activity. See, e.g., Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (a treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given to his opinions)see also Goetz v. Barnhart, No. 05-2267, slip op. at 2 (8th Cir. June 2, 2006) (unpub. per curiam) (declining to give controlling weight to the treating physician's opinion because the treating physician's notes were inconsistent with her residual functioning capacity assessment).

factor to consider in determining claimant's credibility). Likewise, the ALJ stated the record failed to reveal Claimant's medication not to be effective, or that Claimant suffered severe side-effects. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001); Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). The ALJ also noted that Claimant was not compliant with treatment recommendations on a number of occasions. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility.").

The ALJ further noted that Claimant takes over-the-counter medications for pain, not narcotic pain relievers. See Masterson v. Barnhart, 363 F.3d 731, 739 (8th Cir. 2004) (ALJ properly considered that claimant did not take narcotic pain medication in finding her complaint of extreme pain not credible); Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (holding that pain which can be remedied or controlled with over-the-counter analgesics normally will not support a finding of disability). Further, the ALJ noted how by her own admission, Claimant is able to engage in household chores and activities. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence."). The ALJ opined these to be consistent with light work. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to care for one of his children on a daily basis, drive car infrequently, and go grocery shopping occasionally). These observations are supported by substantial evidence on the record as a whole.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied

relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by <u>Polaski</u>, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each <u>Polaski</u> factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. <u>See</u> <u>Brown v. Chater</u>, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. <u>Id.</u>; <u>Reynolds v. Chater</u>, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. <u>See</u> <u>Leckenby v. Astrue</u>, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. <u>See</u> <u>Guilliams</u>, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included Claimant's minimal,

ongoing treatment for pain, her lack of functional restrictions by any physicians, her daily

activities, lack of objective medical evidence, noncompliance with recommended treatment, and

lack of pain medications.  The ALJ's credibility determination is supported by substantial evidence

on the record as a whole, and thus the Court is bound by the ALJ's determination.  See Cox v.

Barnhart, 471 F.3d 902, 907 (8th Cir. 2006);   Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir.

1992).  Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints.  See

Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's

complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment

was not consistent with amount of pain described at hearing, that level of pain described by

claimant varied among her medical records with different physicians, and that time between

doctor's visits was not indicative of severe pain).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the

record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this

Court may not reverse the decision merely because substantial evidence exists in the record that

would have supported a contrary outcome or because another court could have decided the case

differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d

817, 821 (8th Cir. 1992).  Accordingly, the decision of the ALJ denying Claimant's claims for

benefits should be affirmed.

B.       The ALJ's Residual Functional Capacity Assessment

Claimant argues that the ALJ erred in determining a residual functional capacity not based upon all of the medical evidence.

At step three of the evaluation process the ALJ found that the Claimant has degenerative disc disease of the cervical spine, status post right shoulder distal clavicle resection and subacromial decompression, arthroscopic bursectomy and distal clavicle resection of the left shoulder, remote history of left carpal tunnel release, and a depressive disorder not otherwise specified, but that they do not meet or equal a listed impairment. At step four, the ALJ found that the Claimant is unable to perform her past relevant work and a full range of light work, but she is capable of performing work involving frequently lifting over ten pounds or occasionally lifting over twenty pounds, standing and/or walking for six out of the eight hours; sitting for six hours in an eight-hour workday, no reaching overhead; avoiding constant power gripping and grasping with her left hand; avoiding vibrating machinery with her left hand; and avoiding unprotected heights. Accordingly, the ALJ found that Claimant's allegations of disabling symptoms precluding all substantial gainful activity are inconsistent with the evidence on the record and not credible. See 20 C.F.R. § 404.1545 (defining RFC as "the most [a claimant] can still do despite" his "physical or mental limitations.") The ALJ found that the Claimant retains the residual functional capacity ("RFC")to perform work and identified light unskilled occupations. Thus, the ALJ determined that the Claimant is able to perform jobs such as general office clerk and outside deliver, and such jobs exist in significant numbers.

"The ALJ must determine a claimant's RFC based on all of the relevant evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of

treating and examining physicians, as well as the claimant's own statements regarding his limitations. McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); McKinney v. Apfel, 228 F.3d 860 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered." SSR 85-16.

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218. In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole. Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In Polaski, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a Claimant's subjective complaints. The ALJ must consider all of the evidence presented, including the claimant's prior work record and observations by third parties and treating and examining physicians as to:

      1.      the claimant's daily activities;

      2.      the duration, frequency and intensity of the pain;

3.　　　any precipitating and aggravating factors;

4.　　　dosage, effectiveness and side effects of medication; and

5.　　　any functional restrictions.

Polaski, 739 F.2d at 1322.  The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  See also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989); Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir. 1991).  "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review."  Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995).  However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically.  The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record." )

The ALJ's determination of the Claimant's RFC is supported by substantial evidence in the record.  The ALJ properly evaluated the medical evidence in the record, and opined that the medical evidence diminishes Claimant's credibility.  The ALJ noted that Claimant did not seek sustained and regular medical treatment for any her symptoms.  In particular, the ALJ rejected Dr.

Poetz's findings and relied on the opinion of Dr. Yu, a specialist in orthopedic surgery and the medical expert at the hearing. Dr. Poetz's findings were inconsistent with other evidence in the record. Cf. Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)(treating physician's vague and conclusory opinion is not entitled to deference); see Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (ALJ's decision to discount or even disregard the opinion of a treating physician will be upheld "where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermined the credibility of such opinions")(citations and internal quotation marks omitted). The ALJ noted how Dr. Yu relied upon the reports of other treating orthopedic specialists, Dr. Dowling and Dr. Lee, in formulating his opinion. As noted by the ALJ, the objective medical evidence included in Dr. Poetz's own treatment notes show Claimant should avoid excessive and repetitive use of the upper extremities and avoid heavy lifting and strenuous activity. Likewise, Dr. Poetz's conservative treatment of Claimant and the lack of functional limitations previously imposed by him undermine the credibility of the opinions set forth on October 3, 2002. A review of the record shows no substantive evidence to support Dr. Poetz's finding Claimant permanently and totally disabled and unemployable in the open labor market. Thus, the ALJ's determination not to rely on Dr. Poetz's opinions was not improper. The substantial evidence on the whole record supports the ALJ's conclusion that Dr. Poetz's opinions were not entitled to controlling weight.

The ALJ further noted that the record is devoid of any physician finding or imposing any physical limitations upon Claimant's functional capacity. The ALJ opined that Claimant's assertions regarding the intensity and frequency of symptoms are inconsistent with Claimant's

history of treatment. The ALJ also properly considered the Polaski factors in concluding that Claimant lacks credibility. The ALJ listed facts from the Claimant's hearing testimony regarding the Polaski factors that reflected upon the Claimant's ability to perform light work such as her daily activities. Further, the ALJ pointed out other inconsistencies in the record that tended to militate against Claimant's credibility. Those included Claimant's gaps and inconsistencies in medical treatment, her testimony regarding her daily activities, the absence of objective medical evidence of deterioration, the absence of any doctor finding Claimant disabled or imposing any functional limitations, and her daily activities. Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that the Claimant retains an RFC to perform light work. See Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004) (in determining residual functional capacity, ALJ must consider medical records, observations of treating physicians and others, and claimant's own descriptions of her limitations; hypothetical is sufficient if it sets forth impairments supported by substantial evidence and accepted as true by ALJ). The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision. Notably, Claimant was free to provide evaluations supporting her contentions. See 20 C.F.R. § 404.1512(c) ("Your responsibility.... You must provide evidence show how your impairment(s) affects your functioning during the time you say that your are disabled, and any other information that we need to decide your case."); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) ("A disability claimant has the burden to establish [his] RFC.").

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this

Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).   Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

C.              Vocational Expert Testimony

Claimant contends that the testimony of the vocational expert did not constitute substantial evidence upon which a determination could be made that Claimant was not disabled arguing only that the expert's opinion is flawed because the expert relied on the RFC.

After the ALJ has made a finding at step four that the Claimant cannot perform her past work, he moves on to step five in which the burden shifts to the Commissioner to show that jobs exist in the economy that the claimant is able to perform.  The ALJ will consider the claimant's age, education, and past work experience in determining whether such jobs exist.  20 C.F.R.        § 404.1520.  The ALJ may seek the opinion of a vocational expert regarding jobs the claimant can perform.  Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).  The vocational expert will be asked to respond to a hypothetical question, posed by the ALJ, which includes all of the impairments of the claimant.  The question must "precisely set out the claimant's particular physical and mental impairments."  Leoux v. Schweiker, 732 F.2d 1385, 1388 (8th Cir. 1984).

The ALJ's hypothetical question posed to a vocational expert need not include alleged impairments which the ALJ has rejected as untrue.  Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).  As discussed above, the ALJ properly accorded little weight to Dr. Poetz's functional restrictions and findings inasmuch as the

findings therein were inconsistent with and not supported by the objective medical evidence and the other evidence in the record. In addition, the undersigned notes that the ALJ based his hypothetical question on medical evidence contained in the record as a whole. Accordingly, Claimant's claim that the hypothetical opinion given by the vocational expert was flawed inasmuch as it relied on the RFC should be denied. This claim is without merit inasmuch as the hypothetical included those impairments the ALJ found credible. A proper hypothetical must include only those impairments accepted as true by the ALJ. Pearsall, 274 F.3d at 1220. The ALJ did not include the alleged impairment and subjective complaints that he properly discredited. Based on a proper hypothetical, the vocational expert testified that Claimant was able to perform light work which existed in significant numbers in the local and national economies. Therefore, substantial evidence supports the ALJ's determination that Claimant was not disabled. Id.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning, 958 F.2d at 821. Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

D.    Post-Hearing Medical Records

The undersigned finds that the additional medical records and the letter of counsel submitted by Claimant do not alter the outcome of this opinion. Indeed, the undersigned notes that these records were part of the record before the Appeals Council prior to the Appeals Council finding no basis for changing the ALJ's decision and denying claimant's request for

review of the ALJ's decision. (Tr. 9-13). Thus, the undersigned finds that the treatment notes add nothing new to the record regarding Claimant's alleged disability.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning, 958 F2d at 821. Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the decision of the Commissioner be affirmed.

Judgment shall be entered accordingly.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE



Dated this __21st__ day of March, 2008.